GRACEY, JUDGE:
Claimant, The Lane Construction Corporation, herein presented a claim against the respondent, the West Virginia Department of Highways, for damages in connection with construction of 6.963 miles of the Highland Scenic Highway, also known as West Virginia Route 150, in Pocahontas County. The alleged damages are generally itemized as follows:
1977 Fill Bench Delay $814,580.19
1979 Slide Delay 102,577.22
1980 Costs 1,062,187.70
*74 1980 Escalation for Paving 10,116.30
$2,079,461.41-
The contract was advertised for bids as a "Federal Aid Project HSH-l(l)." Claimant submitted the lowest bid, in the amount of $11,467,571.20 and was awarded the contract on May 14, 1977. The project was through the Monongahela National Forest, heavily wooded, rugged terrain, all high in the mountains. It ran from its westerly end, about two miles east of the Williams River, at Station 822, to its easterly end at Station 1189 + 59 at Route 219. To the south was the Edray Fish Hatchery. To the north was the headwaters of the Elk River. The climate conditions were variable and severe, much rain and cold, limiting the length of a construction season. The environmental considerations posed limitations. Timber cut in clearing the right of way was required to be hauled out of the project area, not wasted. Under Section 642.3.2 of the contract Supplemental Specifications, limitations as to the area of clearing and grubbing and excavations were clearly spelled out.
"... To provide a positive guide in this are no more than 750,000 square feet each of erodible soil will be exposed as a result of (1) clearing and grubbing and (2) excavation, embankment, borrow or waste for a maximum cumulative total of 1,500,000 square feet without the approval of the Engineer. Approval to proceed beyond this point will be contingent upon (1) the Engineer's satisfaction, based on performance, as to the Contractor's ability to proceed with his operation and yet maintain pollution control at the level contemplated by this special provision, and (2) Seeding and Mulching of disturbed areas at the Contractor's expense."
The Claimant's Contractor's Proposal, and the resulting contract, called for completion of the project by June 30, 1980. At the pre-construction conference, held on May 3, 1977, the claimant presented its intended schedule for construction. The claimant anticipated completing the project in 1979. Upon cross examination, Byron F. Wetmore, claimant's Executive Vice President, conceded that "... we thought we would have to have relief on that 1,500,000 square feet." The contemplated schedule called for commencement of this work on the project, nearly seven miles, by the end of July, 1977. "We realized there was a restriction in the specification and hoped we could overcome it." What made him think he could overcome such a restriction? "We've had it before and have overcome it." He also admitted that he had learned "... that some of the people that had constructed some of the earlier work had gone broke trying to finish work that took them two or three years longer than they anticipated to do it."
The claimant's intended construction schedule also showed project excavation work to begin June 1, 1977, and the construction work continuing through a 1977 construction season ending November 15. By Stipulation, the parties agreed that project excavation work began June 27, and Wetmore conceded that claimant closed down the job, for the winter, on about October 16th or 17th. "The weather was of such magnitude at that time that we could not work after *75 October 15." Thus, the 1977 construction season was somewhat shorter than the claimant had planned.
Generally, this project was a cut and fill type operation. The respondent had provided the plans showing the levels at which rock might be found. Claimant was required to excavate to the rock level, then fill, over the rock, with select rock material for drainage, and with earth and rock back to the desired grade. Most of these fill benches were in the easterly half of the project. Also, the respondent had indicated the rock quarry location as being just easterly from a forest road which could provide contractor access to the project at about Station 982, early the mid-point of the project. For several reasons, the claimant elected to begin construction at that mid-point. Weight limitations denied use of Route 39 as access to the westerly end of the project. Claimant would need rock, in the fill bench operations, and the rock quarry was shown as being at Stations 980-988, not conveniently accessible had the excavation work been started at Route 219, the easterly end of the project. As it turned out, that rock quarry was not satisfactory, and rock had to be hauled from another quarry further east. The claimant's plan was to do the more difficult easterly half of the project first. Then, as paving was progressing westerly from Route 219, the excavation and grading work would be progressing from that mid-point westerly, to the westerly end of the project, readied for paving when the paving reached that mid-point.
Not long after the excavation work began, the claimant began to find that the rock was not at the elevations shown on the plans, and in some cases, the rock was not a hard, firm rock base, but soft shale. The first such experience was one where the rock was at a higher elevation than shown. Subsequent excavation areas proved rock at lower elevations than shown. There were about six such areas. In each case, when the indicated elevation was reached, and rock was not found, a few more feet were excavated at respondent's direction. Mr. Wetmore conceded that it is not uncommon to run into such circumstances in the field. However, he added, "The normal reaction is that usually it is done on a continuing basis as differences are found. Normally, decisions are made quickly as to where the elevations are to be established and the redesigns are done, if you will, on a piecemeal basis sometimes, which allows the work to be progressed."
Respondent's alleged delay in making decisions and giving the claimant redesigns is the basis for claimant's 1977 Fill Bench Delay claim in the total amount of $814,580.19. Of this total, $709,473.65 appears to be for idled equipment. $72,800.00 is for stockpiling fill bench materials, for having to move such materials twice instead of once. $9,219.00 is for salaried idle supervisory personnel. $32,306.54 is for higher labor cost for work done in the 1978 and 1979 seasons instead of, as planned, in the 1977 season. The evidence was conflicting as to the length of the delays with reference to the problem areas. Mike O'Neil respondent's geologist, was notified on August 4 and came to the sight on August 8. On August 19, respondent began bore drilling under his direction. There was conflicting evidence as to whether the several sites were bore in a progressive order of priority requested by claimant, but it was apparent that the presence of the drilling rig caused problems for the claimant. According to O'Neil, as a solution and redesign was accomplished, in a few days in most instances, the claimant was furnished with *76 a temporary redesign and, within a day or so thereafter, was formally furnished with the redesign plan. Claimant contends that the respondent was not that prompt; that the delays varied from 3.4 weeks to 9.3 weeks; that the redesign on the Station 1090 area, representing 120,000 cubic yards of material, was not presented until April 13, 1978, 35.5 weeks after the respondent was notified of the problem on August 6, 1977, but one must remember that weather closed down the project for the winter on about October 15, 1977, until claimant resumed work in April of 1978. Of course, the respondent had no control over the kinds and numbers of items of equipment the claimant brought to the job, or kept there from time to time. It seems a fair conclusion that more equipment was on the job site, in the claimant's desire and intention to complete the contract by the end of the 1979 season, that if the claimant had planned for use of the full time allowed for completion, to June 30, 1980.
Claimant contended that, at the end of the 1978 construction season, claimant was near to being back on its own schedule for the project and intended to finish the project by the end of the 1979 construction season.
As the 1979 construction season began, slips and slides over the previous winter months were apparent in the westerly half of the project area. Claimant presented evidence that respondent was dilatory in providing redesigns for these slide areas. One potential slide area, at Station'965, just west from the center of the project, was noted by claimant about May 19 and brought to the respondent's attention. By September 5, when Hurricane David rains caused a "catastrophic slide" there, the respondent had still given no direction. Of course, this slide limited claimant's access westerly. Claimant's listing of its 1979 damages begins as of September 6 and continues through September 29, and is wholly for idled equipment in the amount of $102,577.22. Except for the occurrence of that slide, claimant contends it would have finished the project in six or seven weeks, before the end of the 1979 construction season. A slide design correction was supplied on September 26. Clearing the slide took about five or six weeks, and claimant was paid under force account for that work. The project was closed down for the winter on November 30. Claimant's contention is that the September 5 slide, and the resulting delay, would not have occurred had the respondent taken timely action with reference to how the area at Station 965 was to be stabilized after it was brought to the respondent's attention about May 19.
'Thus, the claimant claims the excess of its 1980 costs. At the contract price, claimant was paid $233,396.00 for the contract work done in 1980, this being $1,062,187.70 less than its listing of actual costs.
Also, claimant's paving subcontractor, Pocahontas Construction Company, was only committed to its bid or subcontract prices to June 30, 1980, the date the contract was required to be completed. For paving work after that date, higher prices had to be paid by the claimant in the excess amount of $100,116.30.
Throughout the presentation of this case, it was emphasized that the claimant was fully paid for the expected contract work at the contract prices and was fully paid through change *77 orders and force account, for extra excavation, obtaining rock from an alternate quarry area and for slide correction. No liquidated damages were assessed for the delay in completion, for the period from July 1 to October 9, 1980.
From all of the evidence, it appears to the Court that the claimant did suffer some delay and idling of some equipment while fill benches were being redesigned. With reference to the slide at Station 965, it was under observation and study from May 5, 1979, with a temporary correction for by-pass, until the slide occurred on September 5. The Court refuses to find the respondent responsible for the occurrence or consequences of that slide. The claimant was awarded the additional force account work of correcting the slide and no liquidated damages were assessed for the extra time used to complete the contract.
The Order entered by this Court on February 28, 1983, is hereby set aside.
Upon due consideration of all the evidence presented, and in equity and good conscience, the Court makes an award to the claimant in the amount of $322,241.52
In accordance with the provisions of West Virginia Code §14-3-1, interest at 6% per annum is calculated on this award based on the final acceptance date of the project of October 9, 1980. Interest is allowed from the one hundred and fifty-first day after the date of final acceptance, March 8, 1981, until the issuance date of this opinion, January 15, 1988.
Award of $322,241.52 with interest in the amount of $132,690.00, for a total award of $454,931.52.
Judge Hanlon did not participate in the hearing or decision of this case.
*The West Virginia Legislature did not include the payment of this claim in the 1988 Claims Bill as the project was a "Federal Aid Project".